[No. 40144.    Department Two.    October 2, 1969.]

THE STATE OF WASHINGTON, *Respondent*, v. DONALD HENRY VAN AUKEN *et al.*, *Appellants*.\*

*Jackson, Ulvestad & Goodwin,* by *Thor P. Ulvestad,* for appellants.

\*Reported in 460 P.2d 277.

*Charles O. Carroll* and *Patricia G. Harber,* for respondent.

NEILL, J.—Defendants appeal from judgments and sentencing after jury verdicts of guilty on charges of grand larceny by embezzlement.

Defendants are husband and wife. They were employed by Viking Associates in February of 1966 as managers of the Talisman Apartments in Seattle. Their duties included the collecting and depositing of monthly rentals. They were supplied with a bound book containing triplicate rental receipts. The original receipt was to be given to the paying tenant; the duplicate copy was to be removed and attached to the bank deposit slip; and the triplicate copy remained in the book as a permanent record. As compensation for their services, the defendants received the use of an apartment, $100 per month, and small bonuses whenever they persuaded tenants to sign 6-month or 1-year leases.

Relations deteriorated and on July 9, 1966 defendants were advised that they were discharged as of August 1. On July 14, 1966 the defendants disappeared without informing their employer, although the employer's offices were in the same building as, and immediately below, the defendants' apartment. Two days later, not having seen defendants since the late afternoon of the 14th, an officer and an employee of Viking Associates entered defendants' apartment. They found in the abandoned premises the bound receipt book, the bank deposit book and some undeposited rental checks. Through a comparison of the permanent copies of the receipts with the amounts deposited or left behind in the apartment, it was concluded that the defendants had received $1,449.25 more than they had deposited or left behind for their employer. The police were so informed.

By defendants' testimony it was established that they commenced packing their personal belongings on the afternoon of July 14th and left the apartment around midnight. They drove to Everett, spent the night in a motel and continued on to Montana. They then proceeded to California, where they were apprehended and extradited for trial.

Defendants first assign error to the admission of certain testimony by a Seattle policewoman regarding statements made by Mr. Van Auken during the return trip from California. The policewoman had accompanied her husband, a Seattle police sergeant, in bringing the defendants back from California. She testified to statements which she had overheard. At a preliminary hearing, pursuant to CrR 101.20W, the trial court determined that this testimony would be admissible at trial.

Defendants contend that the admission of the policewoman's testimony forced them to take the witness stand and testify against themselves, contrary to the mandate of Const. art. 1, § 9. This contention is without merit. As we said in *State v. Jeane,* 35 Wn.2d 423, 433, 213 P.2d 633 (1950):

> The language of this section [Const. art. 1, § 9] clearly indicates that the constitution grants a privilege. The use of the word "compelled" connotes that the accused must be forced to testify against his will, that the testimony is exacted under compulsion and over his objection.

And as we further stated in *State v. Moore,* 60 Wn.2d 144, 147, 372 P.2d 536 (1962):

> This privilege is not related to the question of admissibility of nontestimonial statements or confessions. . . .
> The proper grounds for the exclusion of a confession are that it has been obtained in violation of the constitutional requirement of due process or that it has not met the test of our statutory requirement for admissibility of confessions.

The admission of this testimony did not operate to "compel" defendants to testify in the constitutional sense of that term. To hold otherwise could create the incongruous result that the state could not introduce otherwise valid evidence simply because defendants might feel a need to take the stand and contradict or explain it.

Defendants also contend that this witness changed her testimony between the CrR 101.20W preliminary hearing and the trial and that this compelled them to take the witness stand and deprived them of a fair trial. Our review

of the record reveals no significant change in the testimony.[1]

Indeed, what change was injected at trial made her testimony more favorable to defendants. Defendants' contention in this regard is ill-founded.

■ Error is assigned to the method of accounting used to show the amount of money allegedly embezzled. It is urged that some of the money received in July was used to balance the books for June and that, in response to the information under which they were charged, the defendants should have been required to account only for the

---

[1]At the preliminary hearing, the policewoman testified as follows:

A. . . . Mr. Van Auken asked my husband off the record how much money they were accused of taking. Q. Was this in response to any question that your husband asked him? A. No, my husband did not ask him any questions. Q. All right. And what did your husband reply? A. He simply told him that he was not at liberty to discuss the case with him, and that he had been advised of his rights. Q. And did your husband say anything further about the amount that had been taken? A. Mr. Van Auken then again asked him, "Well, off the record, can't you tell me how much we're accused of taking?" And my husband said, "$1,500." Q. And what did Mr. Van Auken say at that time? A. He became alarmed and he said, "Well, that's not true," that they hadn't taken that much money. Q. What else did Mr. Van Auken say? A. Well, he said that he was not trying to lessen their guilt, that they had not taken that much money, and if the Viking Associates had been fair with them they would not have had to steal the money in the first place because they felt it . . . belonged to them.

At the trial, the policewoman's testimony on this point was as follows: Q. And then what occurred? A. There was some more conversation in general that took place, and Mr. Van Auken then again asked my husband how much money he was accused of taking, and my husband informed him $1,500. Mr. Van Auken became upset over that, and he said that this was a lie, that he had not—that they had taken the money, but not the amount that they were accused of taking. Q. And what further did Mr. Van Auken say? A. The fact of the matter is, the defendants' attorney mentioned bonuses, and it came to my mind— Q. Just say what Mr. Van Auken said. A. He mentioned that he and his wife had been told that they should have some bonuses coming and that if the Viking Associates had been fair with them, they would not have had to take the money in the first place, but since the Viking Associates did not comply with the things they informed Mr. and Mrs. Van Auken of, that they felt the money was theirs and they were going to take matters into their own hands.

receipts taken in July and not for shortages occurring in June. This argument is not well taken. The amended information in this case charges that defendants:

[D]uring a period of time intervening between the 7th day of July, 1966, through the 16th day of July, 1966, then and there having in their possession as . . . employee . . . money . . . in excess of $75.00, the property of Viking Associates, then and there willfully, unlawfully and feloniously did secrete, withhold and appropriate the same to their own use . . . with intent to deprive and defraud . . .

The information does not purport to state when the defendants obtained possession of the funds. It simply asserts that defendants, having possession during July, there and then embezzled these funds. Thus understood, it is irrelevant that the defendants may have obtained possession of the funds at some time prior to the date specified in the information.

The defendants next assign error to the giving of instruction No. 11, which reads as follows:

If you are convinced by the evidence in this case beyond a reasonable doubt, that the act alleged as the crime with which the defendant is here charged was in fact committed, and you further find that immediately or soon thereafter the defendant fled from the place where such act is alleged to have been committed, then the flight of the defendant is a circumstance to be considered by the jury, together with the other evidence in the case. It is not sufficient in itself to establish the guilt of the defendant, but its weight as evidence is a matter for the jury to determine in connection with all the other facts in the case.

They suggest that the circumstances of their leaving for Everett did not constitute flight. We believe, however, that the facts were substantial and real so as to justify an instruction on flight. Defendants left their employment and place of residence in the middle of the night without advising their employer, even though the employer's offices were in the same building. They left checks and apartment records behind without making up a final deposit record. They

admitted taking $168.80 in cash, which they contended as coming to them as salary and bonus, but did not communicate such contention to their employer in any manner. Further, there was evidence that defendants left a misleading note on the apartment door indicating they had merely gone to the hairdresser. No forwarding address was left with their employer. *Cf. State v. Bryant,* 73 Wn.2d 168, 437 P.2d 398 (1968); *State v. Bruton,* 66 Wn.2d 111, 401 P.2d 340 (1965).

Defendants contend that this instruction made it appear to the jury that the court believed defendants had left Seattle because they had committed a crime and that the instruction amounted to a comment on the evidence. We fail to see any merit in this contention. It is clear from the terms of the instruction that the fact of and weight to be accorded defendants' flight are for the jury to determine and that the jury may not consider flight sufficient in itself to establish guilt. Nowhere in the instruction do we detect the slightest expression or implication of the trial court's own belief. *See State v. Cogswell,* 54 Wn.2d 240, 339 P.2d 465 (1959).

■ Error is assigned to the trial court's refusal to give a requested instruction to the effect that the jury could not find defendants guilty for mere failure to explain the disappearance of the money, nor could guilt be based on a finding that the funds were lost by an error in judgment or the intervention of third persons. Such negative instructions, setting forth matters that will not support a conviction are not required, and it is not error to refuse them. *State v. Gunderson,* 74 Wn.2d 226, 444 P.2d 156 (1968). The failure to give this instruction did not prohibit defendants from arguing their theory of the case to the jury. The record makes it abundantly clear that defendants had every opportunity to present their version of the facts. The instructions amply covered the law relevant to their theory of the case.

■ Defendants take issue with the sentences imposed by the trial court. Under the powers granted by RCW

9.95.200 and RCW 9.95.210, the trial court granted probation and deferred sentences. Among the conditions of the deferral were the restitution of $1,449 to Viking Associates and payment of court costs. Defendants now contend that this amounts to imprisonment for debt, as proscribed by Const. art. 1, § 17. In so contending, defendants attack a statutory procedure that has been recognized as "an enlightened step forward" in the treatment of convicted criminals. *Mempa v. Rhay,* 389 U.S. 128, 137, 19 L. Ed. 2d 336, 88 S. Ct. 254 (1967). Defendants do so by means of a naked conclusion, unsupported by argument or cited authority. Such contentions will not be considered. *State v. Alden,* 73 Wn.2d 360, 438 P.2d 620 (1968). *Cf. State v. Higgins,* 67 Wn.2d 147, 406 P.2d 784 (1965).

■ Finally, we turn to defendant's assignment of error that certain remarks made by the deputy prosecuting attorney during closing argument were prejudicial and constituted misconduct. Most of these statements were allowable under our well established rule that counsel is to be permitted a reasonable latitude in argumentative deduction from the evidence. *E.g., State v. Peeples,* 71 Wash. 451, 129 P. 108 (1912); *State v. Griffith,* 52 Wn.2d 721, 328 P.2d 897 (1958). One portion of the remarks does transcend this reasonable latitude. Toward the end of the closing argument, the deputy prosecutor uttered some remarks, which if taken in a particular context could be construed as implying that defense counsel had fabricated a story for his clients.

In considering this matter, we refer to the context in which the remark was made and the effect it was likely to have upon the jury. *State v. Rose,* 62 Wn.2d 309, 382 P.2d 513 (1963); *State v. Navone,* 186 Wash. 532, 58 P.2d 1208 (1936).

No objection was made to these remarks either at trial or at the argument in a motion for new trial. The record clearly indicates defense counsel's awareness of the misconduct now asserted. During the course of closing argument, defense counsel stated:

Now, counsel, by her objections, would infer that I am trying to mislead you  .  .  .

.  .  .

Another thing, as long as we're talking about it, I'm not on trial here.

Later in the absence of the jury, defense counsel said:

And I want the record to show that at this time I am making objection to numerous—I wouldn't say numerous, but to statements in argument of counsel not supported by the evidence. I'll reserve this until later. I presume the Reporter has the argument of counsel. I want him to check those out with the record, and I want to make this objection at this time. I felt it was improper to make it during argument.

He thereupon dropped the matter. At the hearing on the motion for a new trial, defense counsel was given an express opportunity to raise this matter. The trial court specifically asked him what it was that disturbed him in the course of the argument. In response to this question, defense counsel addressed himself to the prosecution's method of accounting. No mention was made of any asserted misconduct. In passing, we note that this inaction by defense counsel lends considerable credence to the deputy's disclaimer of having made any such charge or inference.

We have repeatedly stated the general rule that the trial court must be given an opportunity to rule on asserted errors and to correct them; and that a failure to afford the trial court this opportunity constitutes a waiver of the right to assert that error on appeal. *E.g., Nelson v. Martinson,* 52 Wn.2d 684, 328 P.2d 703 (1958); *State v. Miller,* 66 Wn.2d 535, 403 P.2d 884 (1965).[2] An established exception to this general rule is found where the misconduct or error is of such a flagrant or prejudicial nature that any curative measure would have been futile. *E.g., State v. Gefeller,* 76 Wn.2d 449, 458 P.2d 17 (1969); *Warren v. Hart,* 71 Wn.2d

---

[2]We also consider relevant, though not determinative, our expression in *Agranoff v. Morton,* 54 Wn.2d 341, 346, 340 P.2d 811 (1969):

Counsel may not secretly nurture an error, speculate upon a favorable verdict, and then, in the event it is adverse, bring forth the error as a life preserver  .  .  .

512, 429 P.2d 873 (1967); *State v. Cogswell*, 54 Wn.2d 240, 339 P.2d 465 (1959). Defendants having failed to apprise the trial court of this claimed error, their contention here must fail unless the misconduct was "incurable" and thus within the exception.

It is our view that any misconduct of the deputy prosecuting attorney was not of so flagrant and prejudicial a nature that it could not have been cured at trial if the court had been given the opportunity. The failure of defendants to claim error, seek a mistrial, or request the court to admonish the jury to disregard the remark was a waiver of error.

Affirmed.

HUNTER, C. J., HILL and HALE, JJ., and DONWORTH, J. Pro Tem., concur.