Rel: March 28, 2025

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# Alabama Court of Criminal Appeals

## OCTOBER TERM, 2024-2025

————————————————

## CR-2024-0426

————————————————

## Dexter Rashad Walker

## v.

## State of Alabama

## Appeal from Jefferson Circuit Court
## (CC-22-2717)

KELLUM, Judge.

Dexter Rashad Walker was indicted for intentional murder. See § 13A-6-2(a)(1), Ala. Code 1975. A jury convicted him of the lesser-included offense of heat-of-passion (provocation) manslaughter. See § 13A-6-

3(a)(2), Ala. Code 1975. The trial court sentenced him to 20 years' imprisonment.

The evidence adduced at trial indicated the following. Shortly after midnight on November 17, 2021, while working the third shift at Samuel Associated Tube Group ("SATG"), a tube-fabrication company, Walker shot and killed John Eric Cole, the stepfather of Walker's son. Walker's son lived with his mother, Shondria Johnson, and Cole, and Johnson testified that she and Cole did not have a good relationship with Walker. The medical examiner determined that Cole had suffered multiple gunshot wounds. One shot entered the front of his left thigh, traveled rightward, and exited through the back part of the inner thigh. One shot entered the front of his right thigh, traveled rightward, and exited through the outside of the thigh. A third shot entered his left buttock and lodged in his left hip. The fatal shot entered the left side of his back near his armpit, went through his left lung, and lodged in his heart. The medical examiner also found two lacerations on the left side of Cole's head and an abrasion over his left eyebrow. Cole had both alcohol and cocaine in his system at the time of his death.

Chris Birchfield, an employee at SATG, testified that he was training Cole the night Cole was killed. He trained Cole in a certain process that began at one workstation and concluded at a second workstation, specifically at Walker's workstation. However, Walker was not at his workstation when Birchfield was training Cole. The State presented evidence indicating that Walker had left the building and retrieved something from his vehicle. Although the State presented no evidence as to what Walker had retrieved from his vehicle, its theory was that Walker had retrieved the gun he subsequently used to kill Cole. Birchfield testified that, as the training concluded, Walker, who had returned to the building, approached his workstation. Neither Walker nor Cole spoke. Birchfield started walking back to the first workstation, believing that Cole was following him, but when Birchfield turned around, Cole was not behind him. Instead, Cole "was in [Walker's] face." (R. 109.) Birchfield could not hear what either Walker or Cole was saying because of the noise of the machinery and his wearing earplugs, but he said that Cole's hands were by his side and that he never saw Cole reach for his waistband. Birchfield said, however, that it appeared that Cole

3

was angry and about to start a fight. Birchfield said that if he had been in Walker's position, he would not have felt safe turning away from Cole.

Birchfield went to the office to inform his supervisor, James Rodda, of the issue between Walker and Cole, and when Birchfield returned, he saw Walker push Cole away and point something at Cole, which Birchfield initially thought was a taser. According to Birchfield, Cole was turning away from Walker and "trying to start to try to get away" when Birchfield heard five gunshots. (R. 111.) Birchfield fled the building, but just before he walked outside, he turned around and saw Walker stand over Cole, who was on the floor, and swing at Cole. Birchfield stayed outside until he saw Walker leave the building, get in his vehicle, and flee. Birchfield then reentered the building, telephoned emergency 911, and attempted to render aid to Cole. Birchfield said that he had never before seen Walker with a firearm at work, that he never saw Cole with a knife that night, and that Cole had not appeared to be under the influence of alcohol or drugs when he was training him.

Law-enforcement officers with the Jefferson County Sheriff's Department responded to the 911 call. They found six fired cartridge casings and one live round at the scene. In addition, a closed pocketknife

4

in a holster was found on Cole's belt. While the officers were working the scene, Walker returned in a vehicle driven by his wife. Walker got out of the vehicle with his hands up and said "'I'm here'" and "'I f'd up.'" (R. 151.) As an officer conducted a pat down of Walker, Walker also said: "'The gun's in the floorboard of the car.'" (R. 151.) A gun was found in the floorboard of the passenger side of the vehicle Walker had returned in, and subsequent examination established that the six cartridge casings found at the scene had been fired from that weapon.[1] The parties stipulated that, by virtue of a court order, Walker was not permitted to possess a firearm at the time of the shooting. Walker was arrested and taken to jail. A few hours later, after being advised of his rights under Miranda v. Arizona, 384 U.S. 436 (1966), Walker gave a statement to Shane Williams, a detective with the Jefferson County Sheriff's Department, in which he claimed that he had acted in self-defense.[2]

---

[1]Testimony indicated that the gun was missing the trigger bar and could not be test-fired for comparison. However, a cast of the "breech face" of the firearm was made for comparison. (R. 191.)

[2]The State did not introduce Walker's statement into evidence. The trial court precluded Walker from introducing the statement into evidence but allowed him to elicit testimony on cross-examination of Det. Williams that Walker had asserted self-defense in his statement. See Part I of this opinion.

In his defense, Walker called his supervisor at SATG, James Rodda, to testify. Rodda testified that, the night of the shooting, Walker approached him as he was headed toward a forklift and asked him to keep Cole away from Walker because Walker "'can't stand him.'" (R. 324.) A short time later, Rodda heard gunshots, and, when he looked, he saw Walker beating Cole about the head.

Walker also testified on his own behalf. He claimed that he had shot Cole in self-defense. Specifically, Walker testified that he and Cole had a tumultuous relationship and that he was "scared, frustrated, [and] worried" when he saw Cole at SATG because, according to Walker, Cole was a "[v]iolent" person. (R. 341.) Walker said that he informed Rodda that Cole was his son's stepfather and that he and Cole should remain separated. He denied that he told Rodda that he did not like Cole, although he admitted during his testimony that he and Cole disliked each other. When Rodda did not take immediate action on his request, Walker went to his vehicle to retrieve "papers" to show Rodda why he "didn't feel comfortable being around" Cole.[3] (R. 343.) When he returned, he saw

---

[3]The record indicates that Walker had previously obtained a protection-from-abuse order against Cole. Because that order had been

6

Cole and Birchfield at his workstation, so he went to the break room to wait for them to leave. When he saw them leaving his workstation, Walker went to his workstation, at which point, he said, Cole approached him aggressively and said: "'I fucking kill you right now.'" (R. 350.) Walker said that he never saw Cole with a weapon and did not know if Cole was armed but that he was "concerned" that Cole might be armed because Cole "was clutching his waistline." (R. 352.) According to Walker, he was scared and felt that he could not turn his back to Cole. In addition, he said that there was no exit to the building near his workstation.

Walker said that he initially fled the scene after he shot Cole because he was scared. He later returned to the scene with his wife. According to Walker, when he returned to the scene, he told law-enforcement officers that he had "fucked up" because he had left the scene. (R. 337.) He also showed law-enforcement officers the location of

---

dismissed several months before the shooting, however, the trial court ruled that it was not admissible. Walker was permitted to testify only in general terms about why he had gone to his vehicle that night and what he had retrieved from the vehicle.

his gun in the vehicle, and later cooperated and gave a statement after his arrest.

After both sides rested and the trial court instructed the jury on the applicable principles of law, including self-defense and heat-of-passion (provocation) manslaughter as a lesser-included offense of intentional murder as charged in the indictment, the jury convicted Walker of heat-of-passion manslaughter. Walker filed a motion for a new trial, which the trial court denied after a hearing.

I.

Walker contends that the trial court erred in refusing to allow him to introduce into evidence the entirety of the statement he gave to Det. Williams under the doctrine of completeness. Specifically, he argues that the State opened the door to his presenting his statement when: (1) the State presented testimony about the pre-arrest spontaneous statements he made when he returned to the crime scene with his wife, and (2) Det. Williams testified that he sought an arrest warrant for murder after Walker had confessed.

The record reflects that, just before the State called its first witness, Walker asserted that if the State presented evidence of the spontaneous

statements he had made when he returned to the crime scene with his wife, which the State had mentioned during opening statements, then he should be allowed, under the doctrine of completeness, to present evidence of the recorded statement he gave to Det. Williams in which he had claimed self-defense. After hearing arguments from the parties, the trial court found that the State's presenting evidence of Walker's prearrest spontaneous statements did not open the door for Walker to present evidence of his postarrest recorded statement to Det. Williams.

During its case-in-chief, the State presented evidence of the spontaneous statements Walker had made when he returned to the crime scene and then called Det. Williams, the lead detective in the case, to testify generally about his investigation. On direct examination, when asked if he had obtained "any warrants" after completing his investigation, Det. Williams stated that he had obtained an arrest warrant for Walker for murder. (R. 212.) On cross-examination, Walker questioned Det. Williams about the circumstances, but not the content, of his recorded statement and his cooperation with law enforcement. On redirect examination, the following occurred:

> "[Prosecutor]: Detective Williams, the defense counsel just asked you about the conversation with their client. After

that conversation, did you obtain the warrant for murder in this case?

"[Det. Williams]: Yes, ma'am, after he confessed."
(R. 221.)

In light of this testimony, Walker reasserted his doctrine-of-completeness argument, arguing that Det. Williams's testimony that Walker had confessed was "not accurate" and opened the door for Walker to present the entirety of his recorded statement, in which he claimed self-defense. (R. 222.) After hearing arguments from the parties again, the trial court ruled that Walker could elicit testimony from Det. Williams that "he did not confess, but, in fact, he [said] that he shot him in self-defense." (R. 225.) The court, however, precluded Walker from introducing into evidence the entirety of his recorded statement. On recross-examination, Walker elicited testimony from Det. Williams that his previous testimony that Walker had confessed was not accurate, that Walker had said that he had acted in self-defense, and that Walker had said that he had sought help from his supervisor, James Rodda, before the shooting.

At the time of Walker's trial, Rule 106, Ala. R. Evid., provided that, "[w]hen a party introduces part of either a writing or recorded statement,

10

an adverse party may require the introduction at that time of any other part of the writing or statement that ought in fairness to be considered contemporaneously with it."[4]

> "The doctrine of completeness 'serves the purpose of allowing a party to explain or rebut adverse inferences which might arise from the fragmentary or incomplete character of the evidence introduced by his adversary.' Ex parte Tucker, 474 So. 2d 134, 135 (Ala. 1985). ... '[T]he rule which frowns upon incomplete confessions is designed to cover cases where an accused, after admitting commission of the criminal act, is prevented from going further and saying anything which might explain or justify his act.' King v. State, 355 So. 2d 1148, 1151 (Ala. Crim. App. 1978)."

DeBlase v. State, 294 So. 3d 154, 217 (Ala. Crim. App. 2018).

As for Walker's argument that he was entitled to introduce into evidence the entirety of his postarrest recorded statement because the State had presented evidence of his prearrest spontaneous statements, that argument is meritless because, "[b]y its very terms, the doctrine of completeness relates only to matters contained in a single conversation." Dawson v. State, 675 So. 2d 897, 905 (Ala. Crim. App. 1995) (opinion on

---

[4]Effective July 15, 2024, four months after Walker's trial, Rule 106 was amended to read: "If a party introduces part of any statement, an adverse party may require the introduction at that time of any other part of the statement that in fairness ought to be considered at the same time. The adverse party may do so over a hearsay objection."

application for rehearing), aff'd, 675 So. 2d 905 (Ala. 1996). See also

Johnson v. State, 823 So. 2d 1, 39 (Ala. Crim. App. 2001) ("[T]he doctrine

of completeness does not extend beyond a single conversation.").

Walker's prearrest spontaneous statements and his postarrest recorded

statement to Det. Williams were not part of the same conversation;

therefore, the doctrine of completeness does not apply.

As for Walker's argument that he was entitled to introduce into

evidence the entirety of his recorded statement after Det. Williams

testified that Walker had confessed, that argument is also meritless.

Rule 106 does not require the admission of the entirety of a statement

after evidence is presented about a portion of that statement. To the

contrary, Rule 106, as it read at the time of Walker's trial, required only

that the adverse party, in this case Walker, be permitted to introduce

that part of the statement "that ought in fairness to be considered

contemporaneously with" the portion already admitted. "More correctly

stated, the general rule is that only so much of the remainder of the

statement or conversation is admissible as it relates to the subject-matter

of the part brought out by the opponent." Charles W. Gamble and Robert

J. Goodwin, McElroy's Alabama Evidence § 14.03(1) (6th ed. 2009)

12

(emphasis added). "[R]elevancy to the subject matter brought out is the standard by which a party might call for the remainder of a conversation partially proved by his opponent." Stockard v. State, 391 So. 2d 1060, 1064 (Ala. 1980).

> "'If a part of a conversation is adduced in evidence by the state as proving the defendant's declarations or confessions of guilt, the defendant has the right to call for the whole of what was said in that conversation relative to the subject matter of the issue. Chambers v. State, 26 Ala. 59 (1855); William v. State, 39 Ala. 532 (1865); Mullis v. State, 258 Ala. 309, 62 So. 2d 451 (1953). The accused is entitled, on cross-examination, to bring out all that he said, at the same time and on the same subject. Parke v. State, 48 Ala. 266 (1872).'"

Johnson, 823 So. 2d at 39 (quoting King v. State, 355 So. 2d 1148, 1151 (Ala. Crim. App. 1978)) (emphasis added).

Although the trial court prohibited Walker from introducing into evidence the entirety of his recorded statement, it permitted Walker to elicit testimony from Det. Williams that Walker had said in the statement that he had acted in self-defense. The trial court's ruling permitted Walker to rebut Det. Williams's previous testimony that Walker had confessed, thereby serving the purpose of the doctrine of completeness, and Walker has failed to allege what other parts of his

recorded statement he believes related to the same subject that ought in fairness to have been considered. Therefore, we find no error on the part of the trial court.

## II.

Walker contends that he was denied his Fifth Amendment right not to testify when the trial court refused his request, made at the close of the State's case, for a jury instruction on self-defense. Specifically, Walker argues that, when viewed in the light most favorable to him, there was enough evidence presented during the State's case-in-chief to support a jury instruction on self-defense and that the trial court's failure to recognize that evidence effectively compelled him to testify on his own behalf.

The record reflects that, at the close of the State's case, Walker moved for a judgment of acquittal. After hearing argument from the parties, the trial court denied the motion and asked if the defense would be calling any witnesses. Defense counsel then requested "a little guidance" and argued that there was evidence presented during the State's case-in-chief indicating that Walker had acted in self-defense. (R. 303.) Counsel asked if the trial court would be "inclined" to give a self-

14

defense instruction. (R. 303.) After hearing argument from the State, the trial court stated:

> "I'm not saying this defendant, of course your client, I am definitely not saying that he has to testify, but I do not believe that it has been enough evidence presented from the State's witnesses for this Court to give a self-defense instruction at this time. But I'm not saying that, that couldn't be met without the defendant, himself, taking the stand. It just has not been met at this time. So I agree with the State of Alabama in this, in that I won't give a self-defense instruction based upon what I've heard so far."

(R. 307.) The trial court then engaged in a colloquy with Walker regarding his right to testify or to not testify, during which Walker indicated that he understood his rights, that he was choosing to testify, and that no one had forced him to testify.

When Walker requested guidance regarding a self-defense instruction at the close of the State's case, he did not argue to the trial court that its refusal at that time to agree to give a jury instruction on self-defense would deny him his constitutional right not to testify. Rather, he waited until after he was convicted and sentenced and raised the issue for the first time in his motion for a new trial.

"Grounds urged in a motion for a new trial must ordinarily have been preserved at trial by timely and sufficient objections." Williams v.

15

State, 710 So. 2d 1276, 1311 (Ala. Crim. App. 1996), aff'd, 710 So. 2d 1350 (Ala. 1997).

> "'To preserve an issue for appellate review, the issue must be timely raised and specifically presented to the trial court and an adverse ruling obtained. The purpose of requiring an issue to be preserved for review is to allow the trial court the first opportunity to correct any error.' Mitchell v. State, 913 So. 2d 501, 505 (Ala. Crim. App. 2005). 'A motion for a new trial will not preserve for appellate review issues that arose during trial that were not objected to at the time they arose.' Glass v. State, 14 So. 3d 188, 194 (Ala. Crim. App. 2008)."

Cochran v. State, 111 So. 3d 148, 153-54 (Ala. Crim. App. 2012). Because Walker did not timely raise this issue during trial, it was not properly preserved for review.

Moreover, even if this issue had been properly preserved, it is meritless. "The defendant in a criminal trial is frequently forced to testify himself or to call other witnesses in an effort to reduce the risk of conviction." Williams v. Florida, 399 U.S. 78, 83 (1970). "That the defendant faces such a dilemma demanding a choice between complete silence and presenting a defense has never been thought an invasion of the privilege against compelled self-incrimination." Id. at 84. In State v. Mendes, 180 Wash. 2d 188, 322 P.3d 791 (2014), the Washington Supreme Court rejected an argument that the defendant was

16

unconstitutionally compelled to testify when the trial court refused to rule on whether there was sufficient evidence presented during the State's case-in-chief to warrant a jury instruction on self-defense. The Court explained:

> "The State argues that like many defendants before him, Mendes had to make the tactical decision, in consultation with his attorney, whether or not to take the stand in his defense. We agree. Our case law has consistently held that a defendant is not 'compelled' to testify in violation of their constitutional rights in a situation like this case. No one forced Mendes to testify in a constitutional sense. The record establishes that in consultation with his attorney, Mendes chose to take the stand. Although defendants are regularly faced with the dilemma of a choice between complete silence and presenting a defense, it has never been thought of as a violation of the privilege against compelled self-incrimination."

180 Wash. 2d at 196, 322 P.3d at 795.

Similarly, here, Walker was not compelled to testify, but he did so voluntarily after being advised of his rights. "That a defendant may need to testify or present evidence in order to raise self-defense does not violate State or Federal constitutional privileges against self-incrimination." Commonwealth v. Toon, 55 Mass. App. Ct. 642, 651 n.12, 773 N.E.2d 993, 1003 n.12 (2002). Therefore, the trial court's ruling at the close of the State's case did not violate Walker's Fifth Amendment right not to testify.

17

III.

Walker also contends that the trial court erred in considering his criminal history when sentencing him.

At the sentencing hearing, the State pointed out that, although he did not have any prior convictions, Walker had numerous prior arrests for violent offenses, as listed in the presentence report. In imposing sentence, the trial court noted that it had considered several factors and then stated:

> "I do think that if he had been held accountable at some time in the past, then maybe we wouldn't be here today. Because in looking at the pre-sentence investigation report, I noticed that there were several arrests, and I noticed that there was several dismissals. The thing that came to my mind was I said, I hated that he got all of those dismissals, because maybe if he had been held accountable for some of that conduct, then we wouldn't be here today."

(R. 456.)

"It is well settled that in imposing sentence a trial judge may consider evidence of criminal conduct not resulting in conviction." Kuenzel v. State, 577 So. 2d 474, 530 (Ala. Crim. App. 1990), aff'd, 577 So. 2d 531 (Ala. 1991). As long as the trial court was not under the mistaken belief that the defendant's prior arrests were actual convictions, which the trial court here was not, a trial court may properly

18

consider a defendant's arrest record. See, e.g. <u>Godfrey v. State</u>, 383 So. 2d 575 (Ala. Crim. App. 1980). The trial court did not err in considering Walker's criminal history that was contained in the presentence report when imposing sentence.

Based on the foregoing, the judgment of the trial court is affirmed.

AFFIRMED.

Windom, P.J., and Cole, Minor, and Anderson, JJ., concur.